SMITH v. I. C. R. R. CO.

(February 11, 1929. Opinion and Decree.)
(March 4, 1929. Rehearing Refused.)
(April 22, 1929. Writ of Certiorari and Review Refused by Supreme Court.)

Emmet Alpha and Claude L. Johnson, of New Orleans, attorneys for plaintiff, appellant.

Wm. A. Porteous, Jr., of New Orleans, attorney for Maryland Casualty Co., intervener.

Arthur A. Moreno, of New Orleans, attorney for defendant, appellee.

WESTERFIELD, J., dissents.

JANVIER, J. This suit is the outgrowth of an accident in which Milton Smith was killed while driving a Ford tire repair truck across the tracks of defendant company at "Protection Levee," just beyond the city limits of New Orleans, at about 2:00 p. m., on June 21, 1926.

Smith had been sent by his employer, Delta Service Station, to fix a tire for a Mr. Simon F. O'Dwyer, who lived a short distance farther from the City of New Orleans than the crossing where the accident occurred. After fixing the tire, he was returning to the city and was closely followed by O'Dwyer.

At the scene of the accident there were four parallel railroad tracks, two belonging to defendant and two to Louisiana Railway & Navigation Company. As Smith approached the tracks, the first was the Illinois Central inbound track, then its outbound track, then the two tracks of the Louisiana Railway & Nav. Co. Parallel to the road on which he was driving there was the so-called "Protection Levee." This levee extended up to a point a few feet from the inbound track, but the end nearest the track was sloped, or graded, so that the toe was much nearer the track then the top.

As Smith neared the tracks, he saw a long freight train going towards the city on the first track. This train crossed the roadway from his right to his left. There is some conflict in the testimony as to whether he had to stop to allow this train to pass, or whether he approached the crossing just as the last car was passing over it and, therefore, only reduced his speed. Whichever he did, it is certain that as soon as the last car passed he put on speed and crossed the track on which the train had, but an instant before, crossed the roadway. As he reached the second track he was struck by a locomotive of defendant company, going away from the city, that is, in the direction opposite to that in which the other train had passed. His truck was found afterwards at a point estimated by plaintiff's witnesses as thirty feet away from the track, practically demolished, and he, himself, was so badly injured that he died very soon after being struck.

Plaintiff makes all the usual charges of negligence; that the speed of the train was excessive; that the whistle was not blown; that there was no flagman at the crossing, and that a particularly dangerous situation existed because of the obstruction to the view which resulted from the location of the "Protection Levee," and from the confusion resulting from the running of two trains so near together and in opposite directions.

Before discussing the actions of defendant's employes, it seems to us advisable to determine whether Smith, himself, was free from fault, because, whatever may have been the negligence of defendant's employes, plaintiff cannot recover if Smith

was guilty of any negligence which contributed proximately to the accident.

We are immediately impressed with three significant facts:

First: After the passing of the first train, Smith did not wait to see if the other track was clear. Plaintiff's witness, O'Dwyer, says:

"A. He was stopped forty feet back and as soon as the caboose or last car passed, he started.
"Q. And he never did stop?
"A. No, sir.
"Q. And he started as soon as he could?
"A. He was back forty feet and as soon as he could he started.
"Q. And after he started he kept going?
"A. He never stopped any more."

The second fact with which we are impressed is that Smith's truck, according to plaintiff's witnesses, was found thirty feet or more, not along the track in the direction in which the train was going, but away from the track in the direction in which it, itself had been traveling. This seems to us to indicate not necessarily speed on the part of the train, but certainly speed and momentum on the part of the automobile truck.

The third fact to which we refer is that Mr. George Schoenberger, a civil engineer of great reputation and a man in whom we, as well as all who knew him, had implicit confidence, made certain observations and measurements at the scene of the accident and testified that when the automobile reached a point twenty-eight feet from the track on which Smith was killed, its driver could see, into the direction from which the train came, a distance of 5,660 feet (Transcript p. 37).

It should be borne in mind that the tracks and the roadway do not cross at right angles, and that a person driving in the direction in which Smith was traveling was, to a considerable extent, facing towards the direction from which the train came. The slightest care on Smith's part, the slightest glance up the track, the slightest delay after the other train had passed, would have averted the accident.

Plaintiff is faced with the overwhelming burden of distinguishing this case from the hundreds of similar crossing cases in which the courts have held:

"When one approaches a point upon the highway, where a railroad track is crossed upon the same level, it is his plain duty to proceed with caution, and if he attempts to cross the track, either on foot or in a vehicle of any description, he must exercise, in so doing, what the law regards as ordinary care under the circumstances. He must assume that there is danger, and act with ordinary prudence and circumspection upon that assumption.
"In attempting to cross, the traveler must listen for signals, notice signs put up as warnings, and look attentively up and down the track.
"Statutes and municipal ordinances in every jurisdiction prescribe specifically the duty of railway corporations in respect to railways crossings; but no failure on the part of the railroad company to do its duty will excuse anyone from using the senses of sight and hearing, upon approaching a railway crossing, and whenever the due use of either sense would have enabled the injured person to escape the danger, the injury is conclusive evidence of negligence, without any reference to the railroad's failure to perform its duty."

Eyma Brown vs. Railroad Co., 42 La. Ann. 355, 7 So. 682.

If plaintiff can recover here, what becomes of the doctrine of Baltimore & Ohio R. R. vs. Goodman, 275 U. S. 66, in which the Supreme Court of the United States said:

"Goodman was driving an automobile truck in an easterly direction and was

killed by a train running southwesterly across the road at a rate of not less than sixty miles an hour. The line was straight, but is said by the respondent that Goodman 'had no practical view' beyond a section house two hundred and forty feet north of the crossing, until he was about twenty feet from the first rail, or, as the respondent argues, twelve feet from danger, and that then the engine was still obscured by the section house. He had been driving at the rate of ten or twelve miles an hour, but had cut down his rate to five or six miles at about forty feet from the crossing. It is thought that there was an emergency in which, so far as appears, Goodman did all that he could.

"We do not go into further details as to Goodman's precise situation beyond mentioning that it was daylight and that he was familiar with the crossing, for it appears to us plain that nothing is suggested by the evidence to relieve Goodman from responsibility for his own death. When a man goes upon a railroad track he knows that he goes to a place where he will be killed if a train comes upon him before he is clear of the track. He knows that he must stop for the train, not the train stop for him. In such circumstances it seems to us that if a driver cannot be sure otherwise whether a train is dangerously near he must stop and get out of his vehicle, although obviously he will not often be required to do more than to stop and look. It seems to us that if he relies upon not hearing the train or any signal and takes no further precaution he does so at his own risk. If at the last moment Goodman found himself in an emergency, it was his own fault that he did not reduce his speed earlier, or come to a stop."

Plaintiff contends that the whistle was not blown. We believe that the negative testimony of plaintiff's witnesses that they "did not hear any whistles," is overcome by the positive testimony of the crew, who give reasons for being so certain that it was blown not once, but many times.

That the brakes were not applied in emergency and only a service stop was made is explained by the engineer on the ground that the car shot out in front of him and was struck before he could do anything at all, and that, when he saw that the crash was so imminent, and that there was no possibility of averting it by any action of his, he instinctively realized an emergency stop might endanger the lives of the banana messengers on the train.

Of all the cases cited by plaintiff, only one seems to us to require explanation and differentiation, and that one only because the accident which gave rise to it took place at the same crossing at which Smith was killed. That case is Betz & Son vs. Illinois Central R. R. Co., 161 La. 929, 109 So. 766. In the Betz case the vehicle was going in the opposite direction from that in which Smith was traveling, so that in the first place the train came upon it from the rear instead of from the front, as is the case here. In the second place the court found in the Betz case that the view of the driver was obstructed, where as here the evidence is conclusive that he could have seen for nearly a mile had he looked. And last and most important of all, in the Betz case the vehicle had traversed three tracks, in full view of the engineer, who was running his engine at only about eight miles an hour. The court found that "at that speed the train could be stopped in twenty or twenty-five feet." So that, in the Betz case, we find an engineer who sees a vehicle about to go over a track on which his engine is approaching at a slow speed: its driver manifestly oblivious of the approach of the locomotive. An application of the brakes would have averted the crash. The engineer, even at that late

moment, had it within his power to save the situation; he had the "last clear chance." Here, the vehicle dashed out from its position of obscurity immediately in front of the locomotive. The engineer not only did not have the "last clear chance" but he had no chance at all.

It would be of no benefit to analyze the conflicting testimony. Some of it is absurd; much of it is manifestly colored. The statement that Smith's body was thrown forty feet into the air is plainly absurd. The statement of O'Dwyer that there was no "stop" sign at that crossing, but that one was put there the next day, is proven to be absolutely untrue.

But all of these questions are of no importance. Such conflict as there was in the evidence was resolved by the jury in favor of defendant, and the trial judge, on motion for a new trial, stated:

"* * * the verdict of the jury meets with my absolute approval."

One fact stands out. Smith could have seen had he looked. That fact bars recovery.

It is therefore ordered, adjudged and decreed that the judgment appealed from be and it is affirmed at the cost of appellant.

———

WESTERFIELD, J., dissenting:

I believe the accident to have been caused by the negligence of the train crew alone and therefore respectfully dissent.